

The following constitutes
the order of the court. Signed April 28, 2014

_____
**Charles Novack**
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: <br> STEPHEN S. COOPER, <br>     Debtor. | Case No. 12-51833-CN <br><br> Chapter 7 |
| DIPEI WENG, ET AL., <br>     Plaintiffs, <br> vs. <br> STEPHEN COOPER, ET AL., <br>     Defendants. | Adversary No. 12-5122 <br><br> **MEMORANDUM DECISION RE: WENG NON-DISCHARGEABLE CLAIMS FOR RELIEF** |

     On July 29, 30 and 31, 2013, September 9 and 10, 2013, and October 1, 30 and 31, 2013, this court conducted a trial on several §§ 523(a) and 727 claims for relief against Stephen Cooper. Due to the distinct nature of these claims, the court informed the parties that it would issue separate memorandum decisions on the Weng non-dischargeability claims, the Cooper-Folb non-dischargeability claims, and on the remaining denial of discharge claims asserted against Cooper. The following constitutes this courts findings of fact and conclusions of law regarding the § 523(a) claims for relief asserted by plaintiffs Dipei Weng and Xinping Yang.[1]

     In 2007, Stephen Cooper was a successful real estate agent for Intero Real Estate Services in Santa Clara County, specializing in high end residential real estate sales. While he generated

---

[1] Plaintiffs Dipei Weng and Xinping Yang are married, and the court will collectively refer to them as "the Wengs."

1

significant commissions from his work, his personal expenses were equally large, and he, during that year, developed a business opportunity that he believed would generate millions of dollars in revenue. Cooper believed that Intero Real Estate Services was under-represented in San Diego and Orange Counties, and he believed that he could convince existing franchises of other real estate brokerage agencies to change allegiances to Intero Real Estate, which he believed offered superior training and administrative assistance to its agents. If he owned these converted franchises, his resulting cut of their commissions would generate substantial, annual income. To accomplish this goal, Cooper created SoCal Partners, LLC ("SoCal, LLC" or the "LLC"), which then signed an Area Franchise Agreement in October 2007 with Intero Franchise Services, Inc (the "Franchise Agreement"). The Franchise Agreement granted SoCal "sub-franchise" master rights in San Diego County. In exchange, SoCal LLC agreed to pay Intero $500,000 over five years (the first payment due upon signing, the remaining annual payments of $100,000 due the first of each year), and a percentage of the revenues collected by it.[2]

Cooper lacked the funds to make the annual $100,000 payments or otherwise support the administrative expenses of SoCal LLC. Accordingly, he solicited funds from former real estate clients who he believed might be interested in the investment.

Cooper was the managing partner and sole employee of SoCal LLC. While it appears to have been a duly formed LLC, with an operating agreement and separate bank account, its activities and funds were completely controlled by him. The SoCal LLC operating agreement (duly prepared by an attorney) indicated that SoCal LLC was seeking up to a million dollars in capital from accredited investors, who would collectively hold a 30% interest in the LLC. The operating agreement described the LLC as having been formed to "purchase the exclusive master franchise rights for each of San Diego and Orange county in the State of California ... for the purpose of converting established, dissatisfied independent and competitor franchise real estate offices within the Licensed

---

[2] Cooper testified that the LLC had an oral option agreement with Intero for the exclusive franchise rights to Orange County. Those option rights depended, however, on his full payment of the $500,000 under the Franchise Agreement. For reasons stated on the record, Cooper was not allowed to introduce the Franchise Agreement into evidence, and this court's understanding of it arises from his testimony and other exhibits.

2

Territory into [Intero] sub-franchisee locations and owing and operating the same . . . ." The operating agreement also authorized a monthly $12,000 management fee for Cooper.

Cooper thereafter began to solicit investors in SoCal LLC. As stated above, most, if not all of his investors were former real estate clients. Cooper testified that he received an early, substantial investment from Bryan Stolle of approximately $300,000, the bulk of which was used to make the first two $100,000 installment payments to Intero.[3] Other than Stolle's investment, Cooper had little success in attracting substantial investments in the LLC. Before soliciting the Wengs' investment in November 2009, the LLC apparently received another $32,500 from two other investors. Cooper did not invest any of his own cash in SoCal LLC.

Given its lackluster ability to attract investors, SoCal LLC was in dire financial straits by November 2009. SoCal LLC only owned one Intero franchise (which already existed when it signed the Franchise Agreement), and it had monthly operating revenues (generated by this single franchise's real estate commissions) of two to four thousand dollars. It had not paid the January 2009 $100,000 installment to Intero, and, as a result, it had relinquished its option to obtain exclusive Intero franchise rights to Orange County. While Intero had not yet terminated SoCal LLC's exclusive franchise rights to San Diego County, Cooper knew that this was a significant possibility. Moreover, the existing non-Intero franchises that Cooper had originally targeted were all suffering from the effects of the Great Recession, and were, in fact, soliciting funds from him to remain open. This was SoCal LLC's financial reality when Cooper began soliciting an investment from the Wengs.

Cooper represented the Wengs in their purchase of their Los Altos, California residence in October/November 2009. Cooper began soliciting their investment immediately after they were in contract to purchase their residence. In a November 15, 2009 email, Cooper forwarded to the Wengs SoCal LLC's executive summary package, pro forma financials and other "investment docs" for their review. His email states in pertinent part that

---

[3] SoCal LLC paid the first $100,000 installment when it executed the Franchise Agreement, and the second installment in early January 2008.

3

MEMORANDUM DECISION RE: WENG NON-DISCHARGEABLE CLAIMS FOR RELIEF
Case: 12-05122    Doc# 146    Filed: 04/28/14    Entered: 04/28/14 09:54:21    Page 3 of 10

"This business model incurs virtually no overhead, utilize[s] the established $27 million Intero Real Estate infrastructure and technology platform and duplicates the proven success that Intero has enjoyed already selling 33 Intero franchise office opportunities throughout Northern California. ... My company currently owns the exclusive Master Franchise rights to San Diego County with an exclusive option for Orange County. There are currently 2,900 target real estate offices located in the territory. We will duplicate the sales and support process already executed in northern California to convert existing real estate offices into 50 Intero Real Estate franchise locations in southern California. Upon reaching this milestone, our company will generate $6,200,000 in annual franchise fees paid by the franchisees on renewable 10 year binding franchise contracts. I have currently received $675,000 in funding I would like to offer you the opportunity to invest as well. Our objective is to return all investors contribution within 18 months and equity profit dividend payments will be made quarterly per each investors equity share for the next 10 years."

The "Executive Summary" provided by Cooper contained similar misstatements and omissions. The Executive Summary stated in part that SoCal LLC had received initial funding of $400,000 "provided by Cooper and a private investor," and that the company had purchased "the 20 year exclusive master franchise rights for San Diego and Orange Counties from Intero Real Estate Franchise Services for $1 million, payable at $200,000 over five years." The Executive Summary painted the LLC's prospects in glowing terms, stating that it "currently has its first franchise operating in the region generating monthly revenue with 8 more new franchisees to open in 2009. Employing three full time experienced franchise commission based salespeople, the company reasonably expects to sell four Intero franchises per quarter to quality existing real estate office candidates who display competence with real estate operations and high ethical standards."

The Executive Summary further exaggerated the investments already made in the LLC. It stated that SoCal LLC had already received $795,000 from qualified investors, including $175,000 from Cooper and $150,000 from Jonathan Jiang. In fact, while Cooper testified that Jiang had promised to invest $150,000, the company's records indicated that he only invested a fraction of that

4

MEMORANDUM DECISION RE: WENG NON-DISCHARGEABLE CLAIMS FOR RELIEF
Case: 12-05122    Doc# 146    Filed: 04/28/14    Entered: 04/28/14 09:54:21    Page 4 of 10

amount.[4] Finally, the Executive Summary included a description of Intero's "Leadership Team," despite the fact that Intero had no operating interest in the LLC.

On November 22, 2009, Cooper sent another email to the Wengs regarding the LLC. Here, he represented that he had invested "$175,000 and I am investing another $100,000." He ended the email by stating that "We expect to sell 50 franchises over the next 48 months which generates $4M per year in net profit. I expect to return your investment within 18 months."

While the Wengs are well educated, accredited investors, they are not real estate agents or experts. Dipei Weng testified she and her husband trusted Cooper (who had done a good job as their real estate agent), they reviewed the material he had sent them, contacted Stolle to confirm that he actually has invested in the LLC, and relied on Cooper's representations before investing in SoCal LLC. On November 30, 2009, the Wengs invested $50,000 in the LLC, and increased their investment by another $7500 in March 2010. They anticipated that the SoCal LLC would use their funds to advance its business prospects.

On December 1, 2009, the LLC's bank account balance was $7,326.35. After depositing the Wengs' initial $50,000 investment (along with an additional $25,000 from a source not described during the trial), Cooper proceeded to withdraw $64,511.00 from Intero's checking account. Cooper testified that he may have used the Wengs' $50,000 to pay personal expenses.

SoCal LLC failed to pay the $100,000 installment fee to Intero due on January 1, 2010. As a result, SoCal LLC and Intero executed a "Termination and General Release Agreement," dated January 10, 2010, which immediately terminated SoCal LLC's exclusive franchise agreements. Cooper did not disclose the Termination Agreement to the Wengs before receiving their final $7500 investment[5]. SoCal LLC did not return any of the $57,500 investment to the Wengs nor pay them any dividend or profits on their investment.

---

[4] Cooper testified that only $500,000 - $550,000 was invested in the LLC, including his phantom $175,000 investment.

[5] Cooper testified that he told the Wengs that the LLC had lost its master franchise rights before they invested their final $7500. Dipei Weng denied knowing this before they made their final investment.

5

**MEMORANDUM DECISION RE: WENG NON-DISCHARGEABLE CLAIMS FOR RELIEF**
Case: 12-05122    Doc# 146    Filed: 04/28/14    Entered: 04/28/14 09:54:21    Page 5 of 10

The court found Dipei Weng to be a credible witness regarding the representations made by Cooper and their reliance on these representations.[6]

**The §523(a)(2)(A) Claim**

Bankruptcy Code § 523(a)(2)(A) provides that "A discharge . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by - (A) false pretenses, a false representation, or actual fraud[.]" A creditor must establish five elements by a preponderance of the evidence to prevail on a § 523(a)(2)(A) claim: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. *Turtle Rock Meadows Homeowners Assen v. Slyman (In re Slyman),* 234 F.3d 1081, 1085 (9th Cir. 2000). A §523(a)(2)(A) claim may also arise from the concealment or intentional non-disclosure of material facts. *In re Evans*, 181 B.R. 508, 515 n.6 (Bankr.S.D. Cal.1995). A debtor's knowledge and intent to deceive may be inferred by circumstantial evidence and from the debtor's conduct. *Edelson v. CIR*, 829 F.2d 828, 832 (9th Cir. 1987); *Donaldson v. Hayes (In re Ortenzo Hayes)*, 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004).

A § 523(a)(2)(A) claim requires that the "target misrepresentation must have existed at the inception of the debt, and a creditor must prove that he or she relied on that misrepresentation." *Reingold v. Shaffer (In re Reingold)*, 2013 WL 1136546, at *5 (9th Cir. BAP Mar 19, 2013); *see also, New Falls Corp. v. Boyajian (In re Boyajian),* 367 B.R. 138, 147 (9th Cir. BAP 2007) (*citing Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill.2002)). Finally, the Wengs must prove their non-dischargeability claim for relief by a preponderance of the evidence.

---

[6] While only Dipei Weng testified, her statements indicated that she was responding on behalf of both her husband and her. Accordingly, this court infers that her testimony regarding her understanding of Cooper's representations, reliance thereon, and damages, similarly reflect her husband's position on these issues.

6

**MEMORANDUM DECISION RE: WENG NON-DISCHARGEABLE CLAIMS FOR RELIEF**
Case: 12-05122   Doc# 146   Filed: 04/28/14   Entered: 04/28/14 09:54:21   Page 6 of 10

The Wengs have met their burden of proof. Cooper's emails and Executive Summary - which he used to entice the Wengs' investments - contained numerous, material misrepresentations regarding (1) the investments already made in the LLC, including Cooper's false statement regarding his personal investment, (2) the number of franchises it expected to own in 2009, and (3) the LLC's financial prospects. These documents omitted to state that the LLC was in default under the Franchise Agreement and was in significant danger of losing its exclusive franchise rights, which were the essence of its business plan. In addition, Cooper never informed the Wengs that he intended to use their investment to pay himself his long unpaid management fees[7]. Cooper, who desperately needed cash investments to save the LLC, knew that his statements were wrong, and he intentionally made these mis-representations and omissions to obtain the Wengs' investment.

Cooper testified that his $175,000 investment represented his decision to defer paying himself his $12,000 monthly management fee, and that the Wengs had received a copy of the LLC's operating agreement which authorized these payments. Dipei Weng testified, however, that she never received the operating agreement. The court finds Weng to be the more credible witness on this issue. Moreover, the most reasonable interpretation of Cooper's statement that he had invested $175,000 in the LLC is that he actually gave the LLC $175,000 of his own cash. Why else would he list his investment alongside those of individuals who actually gave the LLC their money?

This court also finds that the Wengs reasonably relied on Cooper's misrepresentations, and that had they known the truth, they never would have invested the $57,500 in the LLC. Accordingly, this court will enter judgment in favor of the Wengs on their § 523(a)(2)(A) claim for relief and award damages of $57,500.00.

**The §523(a)(4) Claims**

The Wengs also seek a non-dischargeable judgment against Cooper under Bankruptcy Code § 523(a)(4) on the ground that Coopers was a fiduciary who committed fraud or defalcation, and that

---

[7] Dipei Wing conceded that her investment was subject to the Operating Agreement (even though she never received a copy). Accordingly, she does not dispute that Cooper had the right to the management fee. The fraud, however, is Cooper's failure to disclose that he had never paid himself this fee before, that he intended to pay himself now because the LLC was about to tank, and that he may have used the Wengs' investment to partially pay him this fee.

7

MEMORANDUM DECISION RE: WENG NON-DISCHARGEABLE CLAIMS FOR RELIEF
Case: 12-05122    Doc# 146    Filed: 04/28/14    Entered: 04/28/14 09:54:21    Page 7 of 10

he embezzled their investment funds. While this court has determined that Cooper defrauded the Wengs, he was not a fiduciary for purposes of this code section. Bankruptcy Code § 523(a)(4) states that a debt is non-dischargeable if it is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." The term fiduciary when used in the context of a § 523(a)(4) claim for relief has a specialized meaning. To assert such a claim for relief, there must be fiduciary relationship arising from an express or technical trust that existed between the plaintiff and the defendant without reference to the wrongdoing that caused the debt. *In re Lewis*, 97 F.3d 1182 (9th Cir. 1996). While the Wengs contend that Cooper was a fiduciary due to his status as the managing member of the LLC, this relationship was created by his fraudulent conduct. Accordingly, any fiduciary relationship did not exist absent and apart from the fraud itself. As a result, the Wengs cannot satisfy the elements of a fraud/defalcation by a fiduciary claim for relief.

The Wengs also contend that Cooper embezzled their investments. Debts that arise from "embezzlement" are non-dischargeable under § 523(a)(4) of the Bankruptcy Code. Federal law defines the term embezzlement for purposes of § 523(a)(4). *In re Wada*, 210 B.R. 572, 576 (9th Cir. BAP 1997). To prevail on a §523(a)(4) embezzlement claim, a creditor must establish that (1) property owned by another is rightfully in the possession of a bankruptcy debtor; (2) the debtor appropriated such property to a use other than the use for which the property was entrusted to the bankruptcy debtor; and (3) there are circumstances indicating fraud on the part of the debtor. *In re Mickens*, 312 B.R. 666, 680 (Bankr.N.D.Cal. 2004) (citations omitted). The Wengs cannot prevail on this claim for the simple fact that once they invested their funds, they became the LLC's property.

**The §523(a)(6) Claim**

Finally, the Wengs assert that Cooper's conduct gives rise to a non-dischargeable claim under Bankruptcy Code § 523(a)(6). Section 523(a)(6) of the Bankruptcy Code provides, in pertinent part, that an individual debtor cannot discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The "willful" and "malicious" prongs of § 523(a)(6) are analyzed separately. *In re Sicroff*, 401 F.3d 1101,1105 (9th Cir. 2005). The Ninth Circuit has held that an injury is 'willful' "when the debtor has a subjective motive to inflict [such] injury" or when the debtor believes that injury is "substantially certain to result from his own

8

MEMORANDUM DECISION RE: WENG NON-DISCHARGEABLE CLAIMS FOR RELIEF
Case: 12-05122    Doc# 146    Filed: 04/28/14    Entered: 04/28/14 09:54:21    Page 8 of 10

conduct." *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002).

A "malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001). Malice may be inferred based on the nature of the wrongful act. *In re Ornsby*, 591 F.3d 1199, 1207 (9th Cir. 2010).

The Wengs have demonstrated by a preponderance of the evidence that Cooper's conduct was willful and malicious.[8] Cooper's conduct was willful because he knew that he was defrauding the Wengs and that the LLC had little if any chance of ever repaying their investment. His conduct was also malicious, since his fraud was a wrongful, intentional act, which caused the Wengs to lose their $57,500 investment, done without any cause or excuse - other than to generate a pool of cash that he could use for his own benefit. Accordingly, this court will enter judgment in favor of the Wengs on their § 523(a)(6) claim for relief in the amount of $57,500.

**\*\*\* END OF ORDER \*\*\***

---

[8] Actual fraud also may be asserted as a claim for relief under § 523(a)(6). *In re Siadatan*, 2012 Bankr. LEXIS 6121 (Bankr.E.D.Cal. July 24, 2012).

**COURT SERVICE LIST**

Recipients are ECF participants

10

MEMORANDUM DECISION RE: WENG NON-DISCHARGEABLE CLAIMS FOR RELIEF
Case: 12-05122    Doc# 146    Filed: 04/28/14    Entered: 04/28/14 09:54:21    Page 10 of 10