

The following constitutes
the order of the court. Signed May 5, 2014

_____
Charles Novack
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br>STEPHEN S. COOPER,<br>       Debtor. | Case No. 12-51833-CN<br>Chapter 7 |
| DIPEI WENG, ET AL.,<br>       Plaintiffs,<br>vs.<br>STEPHEN COOPER,<br>       Defendant. | Adversary No. 12-5122<br><br>**MEMORANDUM DECISION RE: COOPER-FOLB NON-DISCHARGEABLE CLAIMS FOR RELIEF** |

On July 29, 30 and 31, 2013, September 9 and 10, 2013, and October 1, 30 and 31, 2013, this court conducted a trial on several §§ 523(a) and 727 claims for relief against Stephen Cooper. Due to the distinct nature of these claims, the court informed the parties that it would issue separate memorandum decisions on the Weng non-dischargeability claims, the Cooper-Folb non-dischargeability claims, and on the remaining denial of discharge claims asserted against the defendant. The following constitutes this court's findings of fact and conclusions of law regarding the § 523(a) claims for relief asserted by plaintiff Gail Cooper-Folb.

In 2008, Stephen Cooper was renting a single family residence in Santa Clara County from Sandra Cross. At some point in time, Cross sought to sell Cooper's residence, and required that he cooperate in the sales process. Cross thereafter accepted an offer to purchase the house. Cooper, after learning that the buyers had children, advised the buyers' real estate agent to check California's

sex offender registry. Cooper knew at that time that a convicted sex offender lived directly across the street. Cooper's comment caused the sale to collapse, and Cross thereafter sued Cooper and his then wife in Santa Clara Superior Court for tortiously interfering with her sales contract (the "Cross Litigation").[1]

Plaintiff Gail Cooper-Folb is Cooper's sister and an experienced attorney, with an office in Los Angeles County. In May 2008, Cooper asked his sister to represent them in the Cross Litigation. In his initial email to his sister, Cooper offered to "pay you straight hourly (hopefully disounted [sic]) with a retainer plus normal costs." Cooper-Folb had represented her brother in other litigation, and she agreed to represent him again. In her initial email to her brother, dated May 19, 2008, Cooper-Folb responded by stating that Cooper and his wife could seek to dismiss the litigation via an anti-SLAPP motion, and that if the court granted the anti-SLAPP motion, they could seek attorneys fees from Cross. Despite this comment, Cooper-Folb's May 19, 2008 email clearly stated that she would only represent them on an hourly basis. After stating that she would be "happy" to represent him (a word choice she would soon regret), Cooper-Folb stated that "so we're very clear (because I never want to have a misunderstanding with you again - you are my brother and that is more important than any income) - you will have to pay me hourly to litigate and travel up there.... My regular rate is now between $350 and $450 depending on the kind of case. I would discount it for you to $300."

Cooper and his wife signed Cooper-Folb's representation agreement on May 28, 2008. The three page letter agreement authorized Cooper-Folb to charge an hourly rate and be reimbursed for standard legal expenses. The agreement required the Coopers to pay a four thousand dollar retainer and stated that they would "be billed on a monthly basis and will be expected to pay within 14 days of the invoice. ... Failure to pay invoices for 60 days or more may result in my withdrawing as your counsel."

The letter agreement also discussed the possibility of recovering funds under California Code of Civil Procedure § 425.16 (which authorized anti-SLAPP motions). The letter agreement plainly

---

[1] When the Cross Litigation was commenced, Stephen Cooper was married to Laura Cooper. They later divorced, and Laura Cooper changed her last name to Brandt. The court will refer to her as "Laura Brandt."

stated, however, that "We have discussed that a motion under California Code of Civil Procedure § 425.16 (anti-SLAPP motion) on your behalf which may result in an award of attorney's fees. You understand that an award of attorney's fees pursuant to such motion or any other contract or statute does not limit your obligation to timely pay invoices in full under this agreement not does the amount awarded by the court limit or modify the amount due from you to this office."

With these terms in place, Cooper-Folb began her legal representation of her brother and sister-in-law.[2]

Cooper-Folb responded to the complaint by filing a demurrer and an anti-SLAPP motion. She informed Cooper that it would take 8- 10 hours to prepare these pleadings, which would consume almost all of the Coopers' four thousand dollar retainer. Cooper responded to this email by imploring his sister to "really try to keep your fees at the $4k you already received."

Cooper-Folb's drafting of the demurrer and anti-SLAPP motion did exhaust the retainer, and after traveling to Santa Clara County Superior Court to argue the motions in June 2008, the Superior Court denied the demurrer and the anti-SLAPP motion. Cooper-Folb promptly informed her brother that she believed that the Superior Court had erred, and that they had a strong appeal. The Coopers authorized the appeal.

Cooper-Folb filed the notice of appeal on July 18, 2008, and the Court of Appeals ultimately issued a published opinion reversing the denial of the anti-SLAPP motion almost three years later on July 11, 2011. The Court of Appeals remanded the case to Superior Court "for further proceedings on the motion, including ruling on evidentiary objections and determining whether Cross has met her burden to show probability of success on the merits of the challenged causes of action." A month earlier, Cooper-Folb filed a motion to withdraw as counsel for the Coopers (presumably for lack of payment), which motion was denied on July 11, 2011. The Court of Appeals reconsidered this order a few days later, and granted Cooper-Folb's withdrawal motion on July 13, 2011. On September 20, 2011, Cross's attorney informed the Court of Appeals (which continued to retain jurisdiction over

---

[2] The Coopers also retained a Santa Clara County attorney, D. Kent Westerberg, to act as Cooper-Folb's local counsel.

Laura Brandt's appeal) that the parties had settled the Cross Litigation and were dismissing the entire action with prejudice. The settlement did not require Cross to pay Cooper-Folb's legal fees.

In the three year interim between the notice of appeal and the Court of Appeal's ruling:

(a) Laura Brandt and Stephen Cooper separated and eventually divorced, which saddled Cooper with substantial, monthly support payments.

(b) Laura Brandt filed her own Chapter 7 bankruptcy, which contributed to the appellate delay.[3]

(c) The Great Recession began, significantly affecting Cooper's already strained personal cash flow.

(d) Cooper dedicated a significant amount of professional time trying to develop a new real estate business (more fully described in this court's memorandum decision regarding the Wengs' § 523(a) claims for relief), which ultimately failed.

Each of these developments affected Cooper's ability to pay his sister's legal bills. While Cooper still generated a significant income as a real estate agent, his personal monthly expenses were onerous. While there is no question that Cooper - who began dating and ultimately became engaged during this time - dedicated a goodly sum of money towards his budding romance, Cooper was perpetually strapped for funds during this period.

Cooper-Folb continually pressed her brother for payment while the Cross Litigation languished on appeal, with little success. The evidence is replete with emails between the siblings in which Cooper-Folb would describe her most recent work product and respectfully request that Cooper pay her monthly invoices. Cooper generally responded by thanking her for the hard work, detailing his pending real estate deals, and promising to make partial payments towards this debt. For example, in an October 17, 2008 email to Cooper-Folb (which responded to her October 17th email reminding him of her unpaid invoices), Cooper discussed the status of the appeal and their litigation strategy, and his ability to pay her bills. "Regarding money, I am sorry I haven't been able to pay your invoices yet and I know you are not a bank and need money to live as well. All that is going on in the world (i.e. banks closing, real estate market down, mortgage industry meltdown, government bailout) is directly hitting my business and I am having to survive through the next 2 - 3

---

[3] Laura Cooper filed her Chapter 7 in or around September 2010, and the Court of Appeal decided in or about April 2011 to proceed as to Stephen Cooper only.

4

Case: 12-05122    Doc# 147    Filed: 05/05/14    Entered: 05/05/14 11:41:37    Page 4 of 9

months or face major problems. I have a meeting with my business partner and fiancier, Bryan, next week to discuss more funding which means, more equity ownership to Bryan but it must be done. I expect he will provide more funding to me and we can get you paid some money." Cooper-Folb's records indicate that Cooper paid her $600 in November 2008 towards her then $7,829.80 balance due.

By October 2010, Cooper-Folb's unpaid fees had increased to $76,008.77. In the two years since the October 2008 email, Cooper had paid his sister less than $1,000. In November 2010, Cooper assigned a percentage of his future real estate commissions to his sister to ensure some payment towards his legal bills. Cooper promised to pay his sister 5% of his commission for all sales under $2 million and 8% of his commission for sales exceeding $2 million.[4]

Cooper paid these percentages on the first two escrows, but reneged on the third escrow in the spring of 2011, and on all subsequent sales.[5] This breach led to an even more strained professional and personal relationship between Cooper-Folb and her brother. After Cooper-Folb informed her brother that she would sue him if he did not pay her unpaid invoices (now totaling approximately $100,000), Cooper responded in an April 4, 2011 email by offering an alternative understanding of their representation agreement. "The fact is you made an agreement to be paid by Cross upon the favorable SLAPP motion decision. When you lost the SLAPP motion, you made the renewed agreement to be paid upon the successful appeal decision. You made an agreement with me Gail. You said you will wait for any payment until the appeal is decided with your expectation the Appeal will be in my favor and you will collect from Cross. You are now attempting to breach our agreement and are attempting to change the agreement we made. . . . We need to wait to see if you won the appeal before I pay anymore fees. If you win the SLAPP, then you can collect from Cross."

In their many email exchanges, Cooper's April 4, 2011 statements represent the first written evidence of his desire that Cooper-Folb first look to Cross for payment of her fees. Cooper

---

[4] These percentages would increase to 10% and 15%, respectively, if Cooper did not fully pay his sister's bill within eighteen months.

[5] The third transaction was the March 2011 Emerald Hills escrow, which would have paid Cooper-Folb $9,860.

elaborated on this, however, during the trial. Cooper testified that the written fee agreement was signed solely to allow him to recover fees against Cross when he prevailed on the anti-SLAPP motion, and that he was not personally obligated to pay Cooper-Folb any fees. He testified further that once the Superior Court denied the anti-SLAPP motion, and they realized that far more effort was now required to dismiss the Cross Litigation, he and his sister agreed that he would only pay the costs that she incurred.. Laura Brandt's testimony was also telling. She testified that Cooper believed that Cooper-Folb was over-billing him, and that he believed that Cross, when they prevailed on the anti-SLAPP issue, would pay Cooper-Folb's legal fees.

Cooper-Folb's legal fees in the Cross Litigation totaled more than $100,000. Cooper paid $25.838.25 of this amount. The bulk of this money was either borrowed from his mother or paid from the commissions that he assigned in November 2010. In late 2011, Cooper-Folb commenced a collection action against her brother in Los Angeles County Superior Court. Cooper failed to appear at trial, and on January 5, 2012, the Superior Court entered a $114,193.79 judgment against him.

**The §523(a)(2)(A) Claim**

Bankruptcy Code § 523(a)(2)(A) provides that "A discharge . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by - (A) false pretenses, a false representation, or actual fraud[.]" A creditor must establish five elements by a preponderance of the evidence to prevail on a § 523(a)(2)(A) claim: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. *Turtle Rock Meadows Homeowners Assen v. Slyman (In re Slyman),* 234 F.3d 1081, 1085 (9th Cir. 2000). A §523(a)(2)(A) claim may also arise from the concealment or intentional non-disclosure of material facts. *In re Evans*, 181 B.R. 508, 515 n.6 (Bankr.S.D. Cal.1995). A debtor's knowledge and intent to deceive may be inferred by circumstantial evidence and from the debtor's conduct. *Edelson v. CIR*, 829 F.2d 828, 832 (9th Cir. 1987); *Donaldson v. Hayes (In re Ortenzo Hayes)*, 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004). A § 523(a)(2)(A) claim requires that the "target misrepresentation must

6

have existed at the inception of the debt, and a creditor must prove that he or she relied on that misrepresentation." *Reingold v. Shaffer (In re Reingold)*, 2013 WL 1136546, at *5 (9th Cir. BAP Mar 19, 2013); see also, *New Falls Corp. v. Boyajian (In re Boyajian),* 367 B.R. 138, 147 (9th Cir. BAP 2007) (*citing Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill.2002)). Finally, Cooper-Folb must prove her non-dischargeability claim for relief by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Cooper-Folb has met her burden of proof. First, the preponderance of the evidence indicates that Cooper did not intend to fully pay his sister's legal fees when he signed the representation agreement in May 2008. Cooper signed the fee agreement intending to force his sister to pursue Cross for her unpaid fees once he prevailed on the anti-SLAPP motion. To accomplish this, Cooper paid his sister as little as possible in the interim, which is demonstrated by the fact that he borrowed funds from his mother to pay some of her initial invoices, made little or no payments during the pendency of the appeal, and then signed the commission agreement in November 2010 only to ensure that he was represented until the Court of Appeal ruled. This court does not believe that Cooper-Folb prepared and signed a "sham" representation agreement or that Cooper-Folb agreed to limit her recovery to costs. Her persistent emails demanding payment of her fees either constitute an elaborate ruse or legitimate requests for payment based on the representation agreement. This court opts for the latter. Moreover, it was Cooper who initiated the request for legal services at an hourly rate. Simply, Cooper knowingly misrepresented his intent to pay his sister's monthly invoices, and his execution of the representation agreement was the act that deceived her.

This court further finds Cooper-Folb justifiably relied on her brother's promise to pay. Cooper initiated the request for services, promised to pay her fees, and provided her with a retainer. Moreover, while she may have encountered some difficulty collecting from her brother in her prior representation of him, he did ultimately pay those fees in full. Finally, Cooper- Folb did suffer damages in the amount of her unpaid fees and costs, and these damages are reflected in the Los Angeles County Superior Court judgement against Cooper.

Accordingly, a non-dischargeable judgment for $$114,193.79 shall be entered against Cooper under Bankruptcy Code § 523(a)(2)(A).

7

**The §523(a)(4) Claim**

Cooper-Folb also seeks a non-dischargeable judgment against Cooper under Bankruptcy Code § 523(a)(4) on the ground that Cooper was a fiduciary who committed fraud. Bankruptcy Code § 523(a)(4) states that a debt is non-dischargeable if it is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." The term fiduciary when used in the context of a § 523(a)(4) claim for relief has a specialized meaning. To assert such a claim for relief, there must be fiduciary relationship arising from an express or technical trust that existed between the plaintiff and the defendant without reference to the wrongdoing that caused the debt. *In re Lewis*, 97 F.3d 1182 (9th Cir. 1996). Cooper-Folb cannot establish an appropriate fiduciary relationship. First, Cooper-Folb alleges that Cooper was a fiduciary due to his obligation to protect Cooper-Folb's interest in the attorneys fee award that Cooper possibly could recover if he prevailed on the anti-SLAPP motion. Yet, to the best of this court's knowledge, no such trust res was ever created, since no fees were ever awarded to Cooper. Moreover, the fraud that was committed had nothing to do with the alleged trust res.

Cooper-Folb also seeks a more limited recovery under Bankruptcy Code § 523(a)(4) arising from Cooper's failure to pay her the assigned percentage (totaling $9,860) from the March 2011 Emerald Hills escrow. While this assignment did create a trust res, Cooper-Folb has not demonstrated by a preponderance of the evidence that her brother failed to pay her due to fraud or defalcation. Cooper did pay his sister from the first two commissions after he executed the assignment, which indicates that he intended to comply with these terms. The evidence at trial was insufficient, however, for this court to determine exactly why Cooper reneged on the Emerald Hills escrow. Given the time frame, this court could just as easily conclude that Cooper retained the funds because of his deteriorating financial condition.

Accordingly, judgment on the Bankruptcy Code § 523(a)(4) claims for relief shall be entered in Cooper's favor.

**\*\*\* END OF ORDER \*\*\***

**COURT SERVICE LIST**

Recipients are ECF participants