

The following constitutes
the order of the court. Signed September 10, 2014

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 12-51833-CN |
| STEPHEN S. COOPER, | Chapter 7 |
| Debtor. | |
| DIPEI WENG, ET AL., | Adversary No. 12-5122 |
| Plaintiffs, | **MEMORANDUM DECISION RE:** |
| vs. | **DENIAL OF DISCHARGE CLAIMS FOR** |
| STEPHEN COOPER, | **RELIEF** |
| Defendant. | |

On July 29, 30 and 31, 2013, September 9 and 10, 2013, and October 1, 30 and 31, 2013, this court conducted a trial on several §§ 523(a) and 727 claims for relief against Stephen Cooper. The court has issued separate memorandum decisions regarding the § 523 claims, and the following constitutes this court's findings of fact and conclusions of law regarding the § 727 claims for relief.

### Cooper's Real Estate Background

Stephen Cooper ("Cooper") is a licensed California real estate agent. Cooper joined Intero Real Estate Services ("Intero") in 2004, and he was an Intero real estate agent during the events in question.

Cooper represents buyers and sellers of high end, luxury homes. When he joined Intero (after working for five years as a Coldwell Banker agent), Cooper negotiated a commission

1

agreement which provided him with 85% of the commissions he generated for Intero. Intero generally reserved this commission split for its most successful agents - typically those who annually generated at least $367,000 in commissions. Cooper was a very successful real estate agent for Intero, routinely generating annual commissions that placed him within the top one percent of the company's agents. Cooper testified that between 2005 and 2007 his annual commissions were between $300,000 and $450,000. Even during the dark, early days of the "Great Recession," Cooper still grossed $200,000 in 2008 and again in 2009. As the housing market began to recover, so too did Cooper's commissions. His gross commissions were approximately $281,000 in 2010, and he earned another $371,000 in gross real estate commissions between January 2011 and July 2011.

### The Intero Franchise Business

In October 2007, Cooper formed SoCal Real Estate Partners, LLC ("SoCal" or the "LLC") to establish Intero real estate franchises in San Diego and Orange Counties. Cooper believed that Intero was under-represented in Southern California, and that he could persuade existing real estate agencies to join Intero. As the master franchiser, SoCal would be entitled to receive a percentage of the commissions generated by each Southern California franchise. To accomplish this goal, SoCal and Intero signed an Area Franchise Agreement in October 2007 (the "Franchise Agreement"). The Franchise Agreement granted SoCal "sub-franchise" master rights in San Diego County. In exchange, SoCal agreed to pay Intero $500,000 in five annual $100,000 increments, and a percentage of the revenues collected by it.[1]

Cooper lacked the funds to make the annual $100,000 payments or otherwise support the administrative expenses of SoCal. Accordingly, he began soliciting funds from former real estate clients who were interested in investing in SoCal.

Cooper was the managing partner and sole employee of SoCal, and he fully controlled its activities and funds. The SoCal operating agreement (duly prepared by an attorney) indicated that SoCal was seeking up to a million dollars in capital from accredited investors, who would

---

[1] Cooper testified that Intero orally agreed to give SoCal similar franchise rights to Orange County. This option right was contingent on SoCal's full payment of the $500,000 under the Franchise Agreement.

2

collectively hold a 30% interest in the LLC. The operating agreement described the LLC as having been formed to "purchase the exclusive master franchise rights for each of San Diego and Orange county in the State of California ... for the purpose of converting established, dissatisfied independent and competitor franchise real estate offices within the Licensed Territory into [Intero] sub-franchisee locations and owing and operating the same . . . ." The operating agreement also authorized a monthly $12,000 management fee for Cooper. Cooper ultimately convinced several former clients to invest approximately $500,000 in SoCal.

Cooper and his family lived in Northern California when he created SoCal, and they relocated to Southern California to allow Cooper to focus on SoCal's operations.

Cooper's success selling real estate did not translate to soliciting real estate franchises, and SoCal did not issue a single Intero license in Southern California. As a result, SoCal's only income was the $2,000 to $4,000 in monthly licensing fees it received from a pre-existing Intero franchise in the San Diego area (SoCal was assigned this income stream under the Franchise Agreement). Without any substantial income, SoCal defaulted on its $100,000 master license payments in early 2010, and forfeited its Franchise Agreement rights.

Despite this paucity in income, SoCal's bank account was quite active. Between August 2009 and September 2011, more than $251,000 was deposited into SoCal's Citibank account, and approximately $256,000 was withdrawn. These withdrawals were not used to satisfy SoCal's Franchise Agreement obligations to Intero.

<u>The Cooper-Derner Relationship</u>

In May 2010 Cooper met Nicole Derner ("Derner"), an Intero agent working out of Intero's Santana Row office in San Jose. Their relationship developed rapidly, and on June 24, 2010, Cooper filed for divorce from his wife of six years, Laura Brandt ("Brandt"). Cooper thereafter relocated to the Bay Area and began working out of Intero's Saratoga office. By January 2011, Cooper and Derner were living together in a Los Gatos rental.

Cooper also acted as Derner's business mentor. In a July 2, 2010 email to Tom Tognoli ("Tognoli"), Intero's co-founder and Chief Operating Officer, Cooper promised that "Nicole and I will be there very [sic] morning, seven days a week, crushing it and taking names to make $1m a

3

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   year" and that Derner would "close more volume in the next six months than Jay [an experienced

2   agent] has in the last 2 years."  Cooper also requested that Tognoli assign Derner to Intero's

3   Saratoga office.

4          Cooper's confidence in Derner's talents was not based on her history as a real estate agent.

5   Although Derner obtained her real estate license in September 2008, she apparently had not closed

6   an escrow before teaming with Cooper in May 2010. While Intero was initially reluctant to transfer

7   Derner to the Saratoga office, its reservations were overcome by Cooper's persistent transfer

8   requests, and Derner moved to the Saratoga office in August 2010.

9                              The RealCommissions Agreement

10         Derner and Cooper collaborated not only on their real estate deals, but also on their real

11  estate commissions.  On July 8, 2010, Cooper and Derner jointly executed a Master Commission

12  Advance Agreement (the "RC Agreement") with RealCommissions, Inc. ("RC"), which allowed

13  them to factor their prospective real estate commissions and receive cash before escrow closed.

14  Intero was required to execute a "Broker's Notice and Acknowledgment of Assignment"[2] in

15  conjunction with each RC "Commission Purchase Agreement."  RC would submit these documents

16  to the title insurance company and be repaid (with interest) directly out of escrow.

17         Although Derner and Cooper both signed the RC Agreement, the RC Agreement did not

18  distinguish between the two and simply referred to them as "Agent" for all purposes.  For example,

19  Cooper and Derner were required to pledge their future commission payments as collateral to secure

20  RC's "financing."  Their potential commission rights were identified by the house being marketed,

21  and not by the listing agent (i.e. Cooper or Derner).  The "Broker's Notice and Acknowledgment of

22  Assignment" also generically referred to Cooper and Derner as "Agent," and did not specifically

23  identify Cooper or Derner as the listing agent who was entitled to receive the commission.  The RC

24  Agreement also contained a guarantee clause, obligating the "Agent" to reimburse RC for its

25  advances should the escrow not close.  Cooper and Derner were thus jointly and severally liable for

26  the funds advanced by RC, regardless of who actually listed the property.  Robert Siegelman

27  _____

28         [2]Tognoli signed the Notice and Acknowledgment of Assignment on Intero's behalf.

4

("Siegelman"), RC's principal, stated that RC treated Derner and Cooper as a single economic unit, holding them jointly and severally liable for the representations made and obligations created by the RC Agreement and Commission Purchase Agreements.

Cooper immediately began factoring his potential commissions with RC.[3] Between July 8, 2010 and July 1, 2011, Cooper received approximately $120,000 from RC. Virtually all of these funds were wired directly into Derner's personal checking account with Wells Fargo (Account# xxx-xxx-7416). While the RC Agreement contained wire instructions and banking information for Derner, it had no such banking information for Cooper.[4]

Derner testified that she allowed Cooper to use her bank account because she believed he had closed his bank accounts. Her belief was mistaken. From September 2010, two months after he signed the RC Agreement, through October 3, 2011, Cooper deposited approximately $440,000 into his personal Citibank checking account (Account #XXXX-XXX-5275), a significant portion of which consisted of Cooper's commissions that he did not finance with RC.

Derner did not immediately finance any commissions because she did not close any real estate sales between October 2010 and April 2011. As discussed in greater detail below, this would soon change.[5] And when did it change, it was Cooper, not Derner, who initiated the factoring

---

[3]On July 8, 2010, RC purchased a $10,000 interest in Cooper's future commission interest in a property located at 15432 Banyan Lane in Monte Sereno. On November 19, 2011, RC purchased a $10,000 interest in Cooper's future commission interest in property located at 20980 Canyon View Drive in Saratoga. On November 28, 2010, RC purchased a $10,000 interest in Cooper's future commission interest in Cooper's exclusive listing of 24716 Olive Tree Court in Los Altos Hills. On December 17, 2010, RC purchased an additional $10,000 commission interest in connection with the 24716 Olive Tree Court property. Between February 23, 2011 and February 28, 2011, Cooper sold RC $30,000 of his commission interest in 12012 Emerald Hills Drive in Los Altos. Between May 24, 2011 and June 2, 2011, Cooper sold RC $20,000 of his commission interest in 13600 Spring Valley Road in Morgan Hill. Between June 7, 2011 and July 1, 2011. Cooper sold a RC a total of $30,000 of his commission interest in107 Drysdale Drive in Los Gatos.

[4]The one exception to the pattern of payment via wire transfer was a $1,470 check payable to Derner that related to RC's purchase of Cooper's future commission interest in 51432 Banyan Lane in Monte Sereno.

[5]Between April 27, 2011 and May 3, 2011, RC purchased a total of $15,000 of Derner's future commission interests.

5

1  requests.

2                          The E-Com Agreements

3        RC was not the only company that Cooper used to finance real estate commissions.  On April

4  15, 2010, Cooper and E-Commissions ("E-Com") executed a master commission advance

5  agreement.  Between September 24, 2010 and August 31, 2011, Cooper factored three real estate

6  commissions with E Com (the "E-Com Agreements").  The E-Com Agreements were functionally

7  equivalent to RC's Commission Purchase Agreements, with one notable difference:  Nicole Derner

8  was not a party to the E-Com Agreements.  This did not, however, deter Cooper from factoring

9  Derner's real estate commissions  through E-Com.

10       In the fall of 2010, Derner represented the buyer of a single family home located at 2754

11  Montvavo Place in Campbell.  When this $630,000 sale closed in October 2010, Derner only

12  received $612 from escrow, because Cooper had sold Derner's commission rights to E-Com for

13  $10,000 on September 24, 2010.  E-Com thereafter wired $8,876 (reflecting E-Com's reserves and

14  fees) into SoCal's bank account.

15       On July 1, 2011, Cooper financed Derner's commission arising from the sale of 6579 San

16  Ignacio, San Jose, CA.  This time, E-Com wired $8,876 directly to Cooper's personal Citibank

17  account.   On August 31, 2011, Cooper financed Derner's real estate commission relating to 105

18  Happy Acres Road in Los Gatos, and E-Com again wired its funds (this time, $5,876) into Cooper's

19  personal Citibank account.

20       Derner, not Cooper, was the agent on the Montalvo, San Ignacio and Happy Acre escrows.

21  Regardless, Intero instructed the title company to pay her commission to E-Com - even though

22  Derner presumably did not have any contractual obligation to E-Com.  Derner testified that she did

23  not know that Cooper had sold E-Com a portion of her commission interests in these properties or

24  that E-Com wired the proceeds to Cooper/SoCal's bank accounts.

25                  Cooper's Cold Streak and Derner's Hot Streak

26       On July 20, 2011, Cooper, acting as the listing agent, closed a sale for a single family

27

28

                                         6

residence located at 107 Drysdale Drive in Los Gatos, netting him $86,000 in commissions.[6] Cooper would not close another escrow until December 13, 2012, a span of seventeen months.

Cooper testified that his drought was caused by a conflux of personal problems. In late 2011 Cooper's sister, a practicing attorney, sued him for unpaid legal fees arising from her representation of him in anti-SLAPP litigation that had commenced in 2008.[7] Cooper's mother was drawn into this sibling dispute, and the stress caused by this litigation and his acrimonious dissolution action sapped him of the time and energy needed to market Santa Clara County real property. Cooper also testified that he suffers from gout, and that he experienced a significant reoccurrence during this time period. Cooper testified that its symptoms and medical treatment rendered him unable to work for long stretches of time. Cooper did not call any physician to testify regarding his condition or treatment.

While Cooper's commissions waned, Derner's escrows soared. Her sales streak began on May 11, 2011, when Derner closed an escrow that generated $43,000 in commissions. From May 2011 through January 2013 - a twenty month span that neatly overlapped Cooper's dry spell - Derner (either as listing agent, buyer's agent, or both) closed twelve sales. With the exception of one property that sold for $778,000, the sales prices ranged between one million and three million dollars. This record was even more impressive given that Derner had closed only one real estate sale in her entire career before this streak began. That Derner's success coincided with Cooper's travails was not coincidental. While Cooper claimed that his personal difficulties impeded his own real estate work, his maladies did not prevent him from significantly assisting Derner's sale efforts.[8] Cooper routinely helped Derner locate clients and close at least five deals (typically listings in which

---

[6]Cooper's gross commissions from the sale exceed $140,000. The net commission reflected the following deductions: (i) Cooper's sale of a $10,000 interest in this commission to E-Com; (ii) Cooper's sale of a $30,000 interest to RC, and (iii) $15,600 went directly to Brandt, as per their Marital Settlement Agreement (as explained below).

[7]Gail Cooper-Folb, a co-plaintiff in this §727 action, also filed a §523 claim against Cooper, and judgment has already been entered on that claim in her favor.

[8] Cooper and Derner also traveled extensively during this period, visiting Spain and the Czech Republic in July and August 2011, Mexico in August 2010, August 2011 and May 2012, (iii) Las Vegas in June 2010, December 2010, and November 2011; and New York in June 2012.

Derner held an exclusive listing). Cooper's involvement is summarized below:

*105 Happy Acres Rd.*: This listing closed on September 22, 2011 with a sale price of $1,343,000. Derner earned gross commissions of approximately $28,350 as the listing agent. Colleen Elliot (who owned the property with her husband, Gary Elliot) testified that she initially contacted Cooper when she received one of his mail flyers touting his real estate expertise. Cooper fielded Elliot's initial telephone call and conducted the initial meeting where he pitched them on his sales experience. Colleen Elliot also testified that she and Cooper had numerous phone conversations regarding the sale, and that she gave him written authorization to negotiate with Chase Bank, one of their secured creditors. The Elliots testified that Cooper provided them with various sale-related documents and forms and helped them complete these forms, corresponded with Glori Jarnagan ("Jarnagan"), the escrow officer for Old Republic Title Company (the title company used on virtually all of Derner's transactions), and assisted them when they needed to amend the sale agreement. Given his time and effort, Colleen Elliot assumed that he was their listing agent, and she was surprised to learn that their exclusive listing agreement named Derner as their real estate agent.

*10220 Sterling Blvd*: This listing closed on November 15 2011 with a sale price of $1,225,000. Derner earned approximately $26,000 in gross commissions as the exclusive listing agent. Cooper spent significant time negotiating the sales price with Alan Wang, the buyer's agent.

*962 Willow Glen Way*: This listing closed on November 29, 2011 with a sale price of $1,255,000. Derner earned approximately $26,000 in gross commissions as the exclusive listing agent. Cooper spent a substantial amount of time negotiating with the buyer's agent regarding the sale's financing contingencies and the buyer's deposit. Cooper also corresponded with Jarnagan regarding escrow.

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

Case: 12-05122   Doc# 162   Filed: 09/10/14   Entered: 09/10/14 16:33:43   Page 8 of 27

*14795 Bohlman Road*: This listing closed on March 7, 2012, and generated a $38,000 commission for Derner as the exclusive listing agent. Cooper had numerous phone conversations and email exchanges with the seller and Katy King, who represented the buyer. The transaction was a complicated short sale which required Bank of America's approval, and Cooper was the lead negotiator with Bank of America. King had minimal contact with Derner (who she never physically met during the sale), and she presumed that Cooper and Derner were business partners. While Cooper was not the listing agent, his name and telephone number appeared in the "agent remarks' section of the listing.

*12911 Pierce Road*: This $2.6 million sale closed on March 9, 2012, generating a $54,000 commission for Derner, who was the exclusive listing agent. Cooper extensively communicated with Shelly Chou, the buyer's agent, to resolve the sale contingencies.

In addition to the above work, Cooper attended every open house that Derner hosted and all of her listing presentations, and, as described above, actively participated in the financing of her commissions with RC and E-Com.

<u>Cooper's Divorce and the MSA</u>

Cooper and Brandt were married on December 18, 2004, and have one child, Zachary. They separated on June 22, 2010 and Cooper filed a divorce petition on June 24, 2010. On September 22, 2010, they executed a martial settlement agreement (as amended, the "MSA"), which required Cooper to make substantial, ongoing support payments. The MSA obligated Cooper to pay child support payments of $6,000 per month from October 1, 2010 through January 1, 2011, after which the payment dropped to $3,000 per month; up to $300 of Zachary's monthly health insurance costs; and spousal support of $3,000 per month from October 1, 2010 through January 1, 2011, after which it rose to $6,000 per month until this obligation terminated in April 2012.

The MSA created a trust to ensure Cooper's support payments, and it required that Cooper maintain at least an $18,000 trust balance. To ensure that the trust balance never fell below this threshold, Cooper executed an irrevocable assignment of his real estate commissions, which would

9

1   require a title company to pay the trust directly from escrow.  The parties agreed that the trust would

2   terminate on May 1, 2012.

3         Cooper funded the trust with $45,000, and Brandt promptly withdrew $42,900 from it

4   (representing the first three months of support payments, plus an additional $15,000 that was also

5   due under the MSA).

6         In April 2011 Brandt withdrew another $9,300 from the trust, which dropped the trust

7   balance below the $18,000 threshold.  Cooper did not, however, replenish the trust.  Instead, he paid

8   his May and June 2011 support payments directly to Brandt.  Cooper did not timely make his July

9   2011 support payment, and Brandt was paid $15,600 directly out of an escrow for the sale of 107

10  Drysdale Drive in Los Gatos.

11        Cooper never made another (pre-petition) spousal support payment.  The trust was dry, and

12  Cooper's irrevocable assignment became valueless when Cooper did not close any real estate

13  transactions.

14        These facts are the underlying framework for the § 727 claims for relief.

15                          <u>Legal Discussion</u>

16  I.    <u>Section 727(a)(2) Claims Generally</u>

17        Bankruptcy Code §Section 727(a)(2) provides in relevant part that a debtor should not

18  receive a Chapter 7 discharge if "the debtor, with intent to hinder, delay, or defraud a creditor . . .

19  has transferred, removed, destroyed, mutilated, or concealed . . .  (A) property of the debtor, within

20  one year before the date of the filing of the petition" or "(B) property of the estate, after the date of

21  the filing of the petition."  The party objecting to discharge must demonstrate by a preponderance of

22  the evidence "that [the debtor's] discharge should be denied."  *In re Retz*, 606 f.3d 1189 (9th Cir.

23  2010) (citations omitted).  The debtor's fraudulent intent must be actual, rather than constructive,

24  and "may be established by circumstantial evidence, or by inferences drawn from a course of

25  conduct."  *In re Adeeb*, 787 F.2d 1339, 1342-43 (9th Cir.1986).  Fraudulent intent is generally

26  established through:  (1) the nature of the relationship between the transferor and the transferee; (2)

27  that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or

28  in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was

                                    10

transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer. *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir.1992). The statute requires only that the debtor make the transfer with intent to hinder, delay or defraud "a creditor." There is no requirement that the debtor intend to hinder all of his creditors. *In re Schafer*, 294 B.R. 126 (N.D. Cal. 2003).

The Bankruptcy Code defines "transfer" as follows: "[T]ransfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. §101(54). This definition should be read expansively. *Barnhill v. Johnson*, 503 U .S. 393 400 (1992); *see also*, *In re Huff*, 2014 WL 904537, at *6 (9th Cir. BAP, March 10, 2014). The simple withdrawal of funds from a debtor's bank account, or the deposit of funds into a debtor's bank account, constitutes a "transfer" under §101(54). *Id*.

Finally, denial of discharge claims are "to be construed liberally in favor of debtors and strictly against the objector." *In re Devers*, 759 F.2d 751, 754 (9th Cir.1985). Even though the "fresh start" occupies a central purpose of the Bankruptcy Code, it is limited to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *but see*, *In re Bernard*, 96 F.3d 1279, 1282-1283 (9th Cir.1996) ("Denial of discharge is a harsh result. However, bankruptcy has its roots in equity. To get equity, one must do equity.").

### Cooper's Scheme to Hinder and Delay

Plaintiffs contend that Cooper transferred certain valuable, personal property interests in unrealized sales commissions to Derner, maintained a residual or beneficial interest in these unrealized sales commissions, and/or intentionally failed to disclose such transfers and interest.

Arguably, there is some merit to this argument. Instead of developing his own exclusive listings, Cooper helped Derner become a premier Intero real estate agent. Brandt suspected that Cooper had actually transferred his listings to Derner to avoid his MSA obligations, and raised this issue in their dissolution proceeding. In an October 20, 2011 email, Cooper and Tognoli discussed how Intero should respond to the Superior Court's inquiries on this issue, with Cooper stating that "I

11

need to provide the court with confirmation from you that I have never transferred or conveyed any of my listings to Nicole . . . and furthermore, each and every one of Nicole's listings were listed by Nicole and I have never had any of her listings at any time." Cooper's cynical scheme comes into stark focus in a November 9, 2011 email to Tognoli, where Cooper crows:

> "As you know, Laura's sole remedy per our MSA to replenish her trust is to serve Intero with an assignment for commissions I earn on my own listings which is fine by me. Note I currently have no listings nor do I have any properties in escrow but whenever I list and successfully sell a property, Laura will receive $18,000 from my closing. The [Family Court] judge confirmed Nicole's current listings are not in anyway my listings and I have no claim or right to any of her commissions so Laura will have to wait until I list and sell another home. Are we on the same page boys?"

The subject line of the email triumphantly reads:"I won . . .".

Cooper testified that his health problems prevented him from pursuing his own listings. His testimony was not credible. Cooper extensively traveled with Derner, and significantly contributed to her success as an Intero real estate agent. His involvement was so extensive that in at least one case, the seller testified that she believed Cooper was her agent, and in another, the opposing agent believed that he was Derner's business partner. Cooper himself alluded to his extensive role in Derner's real estate career in a February 15, 2012 email to Siegelman. Cooper sought to reassure Siegelman that financing Derner's future commissions was a low risk transaction. He reminded Siegelman that "we have two other independent deals in contract" and that "you know I am a different animal with never a TFT, $182,000 in commissions due in 3 weeks plus Bohlman plus 3 more listings currently on the market for another for $130,000 plus another 7 properties coming on the market!" These are not the words of a man who is crippled by gout or who has no interest in Derner's potential escrows.

Plaintiffs have established, by a preponderance of the evidence, that Cooper's scheme was designed to hinder or delay Brandt's efforts to collect her support payments. What is less clear is whether Cooper "transferred, removed, destroyed, mutilated, or concealed" anything that could be considered "property" of the debtor or the bankruptcy estate.

12

1

2    <u>Did Cooper Hold a Direct Interest in Derner's Commissions?</u>

3    Plaintiffs allege that Cooper held a direct property interest in Derner's exclusive listing

4    agreements. They contend that 1) Cooper spent significant time and effort ensuring that Derner's

5    exclusive listings promptly closed, which generated her commissions; 2) Cooper factored her

6    commission rights through RC and E-Com; 3) Cooper directly benefitted from her commissions

7    because they were used to pay, *inter alia*, his child support payments, rent, car expenses, certain

8    legal fees, and various other expenses; 4) Derner, who was a relatively inexperienced agent, received

9    a generous 85/15 commission split, which was generally reserved for high performing agents like

10   Cooper; and 5) Cooper admitted his interest in her commissions in emails and other documents.

11   While the evidence certainly indicates that Cooper thought he had a financial interest in

12   Derner's exclusive listings and escrows, this does not establish that Cooper held a legally

13   enforceable property interest.

14   Plaintiffs offered virtually no testimony explaining how a listing agent is paid from escrow.

15   Plaintiffs did introduce, however, form listing agreements (titled "Exclusive Authorization and Right

16   to Sell") in which Derner was listed as either the buying or listing agent (or, in some instances,

17   both).[9] Under these listing agreements, Intero, as the broker, acquired the right to a commission

18   when escrow closed. Each of these listing agreements were executed by Derner as the listing agent.

19   Only the listing agent is contractually entitled to receive a percentage of Intero's commission. Thus,

20   an agent's right to a commission is a matter of simple contract law, *i.e.*, the agent who executes an

21   exclusive listing agreement has a contractual right to receive a commission when the sale closes.

22   Plaintiffs ignore this point, and instead argue that Cooper's work on Derner's listings created an

23   inchoate property right in the exclusive listings themselves. None of the cases cited by the Plaintiffs

24   for this proposition are persuasive. These cases include *Pacific Gas & Electric Co. v. Bear Stearns*

25   *& Co.*, 50 Cal.3d 1118, 270 Cal.Rptr. 1 (1990), which addresses the claim of tortious interference of

26

27   _____

28   [9]Plaintiffs provided the court with Listing Agreements for the Bohlman, Happy Acres,
     Sterling, and Willow Glen properties.

13

contract, two United States Supreme Court cases(*Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930) and *Commissioner of Internal Revenue v. Banks*, 543 U.S. 426, 125 S.Ct. 826, 160 L.Ed.2d 859 (2005) ), neither or which address any issue involving California law, two bankruptcy cases interpreting Arizona and Colorado law on issues that do no closely resemble the one before this court (*In re Ruetz*, 317 B.R. 549, 551 (Bankr. D. Colo. 2004) and *In re Serino*, 2010 Bankr. LEXIS 5025 (B.A.P. 9th Cir. July 12, 2010)); a California appellate decision which determined whether a qui tam claim is community property ( *In re Marriage of Biddle*, 52 Cal.App.4th 396 (Cal.App. 1 Dist. Jan 29, 1997)), and a second California appellate decision which holds that real estate agents with written listing agreements are entitled to damages if the seller breaches their listing agreement (*Berzon v. U.L.C. Corp*., 274 Cal. App. 2d 690 (1969)).  The court therefore finds that Cooper did not transfer any property right to Derner.

Plaintiffs alternatively assert that Cooper had an indirect interest in Derner's exclusive listing through Intero's internal referral policy.  Intero's Employee Handbook (the "Handbook") contains only a limited discussion of its commission referral program.  Section 4.5 of the Handbook, entitled: "Employee Benefits -Miscellaneous Benefits," simply states that "employees that are also licensed through the State of California Department of Real Estate are eligible to receive referral fees" and that "the process must be initiated through Intero's Client Services Group . . . to ensure the transaction is completed properly".  The Handbook's"Referral Scenario" even more cursorily states that "[b]usiness referred to an Intero agent is considered an Internal Referral.  The employee split on internal referrals is 70% of a 25% referral fee."

Plaintiffs have not demonstrated how this language provided Cooper with an enforceable, contractual right in Derner's commissions. The Handbook simply acknowledges that under certain conditions, Intero employees are "eligible" to receive referral payments.  There is nothing indicating that once the issue of eligibility is satisfied, employees are contractually "entitled" to such referral fees.  Moreover, the Handbook contains a lengthy disclaimer which states that "This handbook is not a contract of employment" and that the Handbook "is presented for information and reference only, and is not intended to and does not create a term of employment or an employment contract . . . between the employee and Intero."

14

1   Even if the Handbook's referral language could create an enforceable contract right, it offers

2   no guidance regarding what conduct would warrant the award of a "referral fee." The Handbook

3   tersely states that "[b]usiness referred to an Intero agent is considered an Internal Referral." The

4   Handbook does not discuss how this referral must be made, and Plaintiffs chose not to call an

5   appropriate Intero employee who could describe its referral policy and opine on whether the Cooper-

6   Derner relationship created a right to a referral fee for Cooper. Accordingly, Plaintiffs have

7   provided insufficient evidence for the court to determine whether Cooper had a right to a referral

8   fee, which he somehow transferred to Derner or knowingly forfeited for her benefit.

9   <u>Were Cooper and Derner Business Partners Under California Law?</u>

10   Plaintiffs also argue that Cooper and Derner's business association was a partnership under

11   California law. Under this theory, Cooper did not have a direct interest in Derner's commissions, but

12   rather a partner's claim in the business's profits (i.e. Derner's commissions). Plaintiffs argue that

13   Cooper did not list this partnership interest on his bankruptcy schedules and statement of financial

14   affairs, which constitutes a concealment under §727(a)(2).

15   Whether a partnership was formed is a question of fact, requiring this court to apply

16   objective standards to determine the terms and scope of the partnership agreement. See Civ.Code, §§

17   1550,1565, 1580; *In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278, 1293, fn. 23; *Holmes v.*

18   *Lerner* (1999) 74 Cal.App.4th 442, 453–454; *Billups v. Tiernan* (1970) 11 Cal.App.3d 372, 379);

19   *Weddington, Productions Inc. v Flick,* (1998) 60 Cal.App.4th 793, 811, 71 Cal. Rptr. 2d 265; and

20   *Brant v. California Dairies* (1935) 4 Cal.2d 128, 133.

21   Under California law, "the association of two or more persons to carry on as co-owners

22   business for profit forms a partnership, whether or not the persons intend to form a partnership." Cal.

23   Corp. Code § 16202(a).[10] Generally, a partnership involves sharing in the profits and losses of a

24   continuing business. *Chambers v. Kay* (2002) 29 Cal.4th 142, 126 Cal.Rptr.2d 536, 56 P.3d 645.

25

26   _____

    [10]In 1996, the California Legislature enacted the Revised Uniform Partnership Act (RUPA),
27   entitled the Uniform Partnership Act of 1994 ("the 1994 Act") (Corp.C. 16100 et seq).
    Commencing  January 1, 1999, the Uniform Partnership Act of 1994 ("the 1994 Act") applied to all
28   partnerships formed and operating in California. (Corp.C. 16111; supra, §15.)

15

1  The absence of any specific agreement regarding the sharing of profits and losses does not preclude

2  the formation of a partnership. *Holmes v. Lerner*, 74 Cal.App.4th 442, 454, 88 Cal.Rptr.2d 130

3  (1999).

4     A profit sharing agreement does not alone create a partnership. *In re GoldIen Slip Copy*,

5  2013 WL 2367847 (Bankr. E.D. Cal.,2013 March 01, 2013)( *citing Bank of California v. Connolly*,

6  36 Cal.App. 3rd 350 (1973).  The parties must also jointly manage (albeit not necessarily equally)

7  the business enterprise. *Dickenson v. Samples*, 104 Cal.App.2d 311, 315, 231 P.2d 530 (1951) "The

8  distinguishing feature of partnership is association to carry on business together, not agreement to

9  share profits." *Holmes v. Lerner* (1999) 74 Cal.App.4th 442, *453–454(citing to Universal Sales*

10  *Corp. v. Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 764, 128 P.2d 665); *see also*, *Kaljian v. Menezes*,

11  36 Cal.App.4th 573, 586 (1995) (right of partner to joint participation in management and control of

12  business is an essential element of partnership);  *Bank of California v. Connolly* (1973) 36

13  Cal.App.3d 350, 364("[a]n essential element of a partnership or joint venture is the right of joint

14  participation in the management and control of the business") .

15     A partnership does not require a written agreement, "and where there is no writing

16  evidencing the agreement, the existence of a partnership may be evidenced by the conduct of the

17  parties." *Calada Materials Co. v. Collins* (1960) 184 Cal.App.2d 250, 253; *see also*, Cal. Corp.

18  Code, § 16103(a)( "Except as otherwise provided in subdivision (b), relations among the partners

19  and between the partners and the partnership are governed by the partnership agreement. To the

20  extent the partnership agreement does not otherwise provide, this chapter governs relations among

21  the partners and between the partners and the partnership.")

22     "These statutes recognize persons may unintentionally create a partnership where their

23  actions and behavior demonstrate an intent to engage in business together."  9 Witkin, Summary of

24  California Law (10th ed. 2005) Partnership, section 25, page 60.  It is immaterial that they do not so

25  designate the relationship, or do not know they are partners, for the intent may be implied from their

26  acts.  *Id.  See also*, Unif. Partnership Act (1997) § 202(a), supra note 4, comment 1 at 93. "[the

27  parties] may inadvertently create a partnership despite their expressed subjective intention not to do

28  so. The new language alerts readers to this possibility."

16

Beginning in late June 2011[11] and through the date of his bankruptcy filing (the "Partnership Period"), Cooper and Derner jointly market her real estate business and closed at least five substantial escrows (which on their face were her "exclusive listings"). These escrows generated approximately $131,000 in gross commissions to Derner. As detailed above, Cooper negotiated with various sellers, buyers, agents, title companies, and lenders in these real estate transactions. Cooper also helped Derner create promotional materials regarding these listings, and in some instances, Cooper himself was featured in Derner's marketing materials, along with his personal contact information. Cooper also accompanied Derner on her open houses and her initial client meetings, which were critical to securing the listings.

Cooper also exercised unfettered authority to finance Derner's real estate commissions. Derner had minimal if any contact with RC and E-Com, and their advances frequently were wired into accounts that Cooper completely controlled.

Although Cooper denied that Derner and he were business partners, his statements to third parties suggest the exact opposite. As early as July 2010, Cooper bragged to Tognoli that "Nicole and I will be in there very [sic] single morning, seven days a week, crushing it and taking name to make $1m a year," and he wanted Tognoli to "meet[ ] up with Nicole the week of July 12 . . . so we can go over our partnership plan." In a March 24, 2012 email, Cooper announced that he was looking for an experienced agent or assistant "who can assist Nicole and I take our real estate practice to a whole new level!!" Cooper requested that Tognoli forward this email to the entire Intero firm. In a February 15, 2012 email to Siegelman, Cooper explains that "we have two other deals in contract. Sperry alone is $127,500 and Pierce is $55,000 commission . . ." Both "Sperry" and "Pierce" were Derner's exclusive listings. Cooper then describes himself as a "different animal with . . . $182,000 in commissions due in 3 weeks plus Bohlman." The $182,000 in commissions directly refers to Derner's future commissions from Sperry and Pierce. As stated above, Bohlman was also Derner's exclusive listing.

Derner and Cooper therefore constituted an "association of two or more persons" carrying on

---

[11]Derner first listed the Sterling property on or around June 27, 2011.

17

"a business for profit." Cooper assisted Derner in locating clients, and they jointly marketed the properties and closed the escrows. Cooper's experience and reputation undoubtedly enhanced the profitability of the enterprise, and the evidence undoubtedly demonstrates that they jointly managed and controlled their real estate business.

<u>Did Cooper and Derner Share in the Partnership Profits?</u>

Cooper's deep involvement in Derner's listings was not charitable in nature nor reflective of some significant, mentoring instinct. Several of the commissions financed by RC and E-Com were wired directly into Cooper's personal or SoCal checking accounts, and Cooper testified that he used the SoCal account to pay for his personal living expenses. Moreover, Derner, whose income primarily was generated by her real estate commissions, testified that from January 2011 through the petition date she typically paid the rent on Cooper's residence, which exceeded $4200/month. She also stated that she paid Cooper's rental car payments (which exceeded $14,000 during the Partnership Period)[12] and his cell phone bill, and that she issued several checks to him, which he presumably used for personal expenses.

Derner also allegedly "loaned" Cooper tens of thousands of dollars, and Cooper's bankruptcy schedules list a $50,000 loan from Derner (the "Loan"). While the Loan could call into question the extent to which the parties shared Derner's commissions, the date and circumstances of the Loan render it suspect. Derner testified that the parties signed a written Loan document on March 1, 2012, eight days before the Petition Date. She stated that the Loan was due in full on December 31, 2012 (well after the bankruptcy filing) and that it represented "payments" she made for Cooper between June 2011 and his Chapter 7 petition date (the "Loan Period"). The only "payments" she identified, however, were two child support payments to Brandt in January and February 2012 which totaled $6,100.[13] These checks indicated on their face that they were loans to Cooper. Derner also issued a $12,855 check to Cooper's bankruptcy attorneys, the law firm of DiNapoli and Sibley, that similarly

---

[12] Cooper did not lease a car, but rented vehicles when needed.

[13] Derner made another child support payment to Brandt on March 10, 2012, which is a post-petition payment. Derner testified that the Loan represented funds that she provided to Cooper before he filed his Chapter 7.

Case: 12-05122   Doc# 162   Filed: 09/10/14   Entered: 09/10/14 16:33:43   Page 18 of 27

1  indicated that this was a loan to Cooper. Thus, the evidence indicates that Derner "loaned"

2  approximately $18,955 to Cooper before he filed his Chapter 7. Given Cooper's acrimonious

3  dissolution action and his desire to hide income from Brandt, it is not surprising that the parties

4  hastily created the written Loan document.

5  <u>Did Cooper and Derner Agree to Share the Partnership's Losses?</u>

6  Cooper and Derner jointly and severally agreed to share the potentially substantial losses

7  associated with the RC Commission Agreement if an escrow did not close. Derner and Cooper

8  therefore agreed to share their most significant partnership liability - the money potentially owed to

9  RC.

10  Given the above findings, Cooper and Derner were business partners between (at the very

11  least) July 2011 and his Chapter 7 petition date.

12  (D)  <u>The Partnership is Cause to Deny Cooper his Discharge under §§ 727(a)(2) and (a)(4)</u>

13

14  Cooper concealed his partnership interest to hinder, delay and defraud Brandt. As a result,

15  he is not entitled to receive a Chapter 7 discharge under Bankruptcy Code § 727(a)(2). His failure to

16  to disclose the Partnership on his Bankruptcy Schedules and Statement of Financial Affairs also

17  constituted a false oath under§727(a)(4).

18  Bankruptcy Code § 727(a)(4)(A) provides in pertinent part that "The court shall grant the

19  debtor a discharge unless . . . the debtor knowingly and fraudulently, in or in connection with the

20  case –(A) made a false oath or account. . . ."  This court may deny a Chapter 7 debtor's discharge if

21  1) the debtor made a false oath in connection with the case; 2) the oath related to a material fact; 3)

22  this oath was made knowingly; and 4) the oath was made fraudulently.  Plaintiffs must establish

23  these elements by a preponderance of the evidence.  *In re Retz*, 606 F.3d 1189, 1197 (9th Cir. 2010)

24  (*citing Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005)); *In re Coombs*,

25  193 B.R. 557, 560 (Bankr. S.D. Cal. 1996) *(citing In re Bodenstein*, 168 B.R. 23, 27 (Bankr.

26  E.D.N.Y.1994)).

27  A false oath may involve an affirmatively false statement or an omission from a debtor's

28  bankruptcy schedules or statement of financial affairs.  *Searles v. Riley (In re Searles)*, 317 B.R.

19

368, 377 (9th Cir. BAP 2004) (citations omitted), aff'd, 212 Fed.Appx. 589 (9th Cir.2006). A material fact is one that "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *In re Khalil*, 379 B.R. 163, 173 (9th Cir. BAP 2007). Notwithstanding this broad definition, a "false statement or omission that has no impact on the bankruptcy case is not material and does not provide grounds for relief for denial of a discharge under § 727(a)(4). *Id*. at 172. An act is done "knowingly" when the debtor acts "deliberately or consciously." *Id* at 173. Finally, a fraudulent oath or omission is made fraudulently when the debtor makes a misrepresentation or an omission that at the time he or she knew was false with the intention and purpose of deceiving creditors. *Id*. Courts typically rely on circumstantial evidence to demonstrate this intent. *In re Devers*, 759 F.2d 751, 753-54 (9th Cir. 1985). Recklessness alone does not establish a debtor's fraudulent intent. It can, however, form a part of the circumstantial evidence typically used to establish fraudulent intent. *Khalil*, 379 B.R. at 173.

Cooper did not disclose the Partnership on his Bankruptcy Schedule B or his Statement of Financial Affairs. He also indicated on his Bankruptcy Schedule I that his income was zero. For reasons stated above, these statements were knowingly and intentionally false, and these omissions were material.

Cooper's litigation and health woes did not prevent him from pursuing a very successful business partnership with Derner during the Partnership Period. During the Partnership Period, Cooper was instrumental in Derner earning at least $131,000 in pre-petition commissions, a remarkable feat given that Derner had not generated any commission before her relationship with Cooper. Derner's "income" subsidized many of Cooper's living expenses. Given Cooper's own statements to Tognoli and Siegelman regarding his joint business efforts with Derner, the degree of their professional entanglement, and the substantial benefits Cooper that he derived from their association, these omissions were not innocent oversights.

If Cooper had disclosed the Partnership on his bankruptcy schedules and statement of financial affairs, the Chapter 7 Trustee could have investigated the nature and value of the Partnership. Indeed, one of Derner's exclusive listings closed after Cooper filed his Chapter 7, and

20

1  part of the commission may have been property of the bankruptcy estate.[14] Cooper not only omitted

2  the Partnership, he also misrepresented the nature of his business relationship with Derner during his

3  § 341 meeting, claiming that Derner and his finances were "completely separate." He also stated

4  during the § 341 meeting that his health had prevented him from earning any commissions since July

5  2011. This was also a falsehood.

6      Cooper therefore is not entitled to a discharge under Bankruptcy Code § 727(a)(4).

7      (E)     The Additional 727(a)(4) Claims

8      Plaintiffs also assert that Cooper made a variety of other false oaths in his bankruptcy schedules

9  and during his §341 meeting of creditors.

10     Plaintiffs argue that Cooper's scheduled value of $100 for SoCal was fraudulent, given that he

11  informed Tognoli in March 2011 that SoCal was worth $200,000. The evidence at trial indicated

12  that SoCal was worthless when Cooper filed his Chapter 7 case.

13     Plaintiffs argue that Cooper failed to include in his schedules a sports car, purchased by Derner,

14  and a pool table. Plaintiffs did not introduce any evidence that Cooper owned the car or the pool

15  table when he filed the Chapter 7.

16     Plaintiffs contend that Cooper did not disclose his right to referral fees in Derner's real estate

17  listings. For the reasons stated above, Plaintiffs did not establish that Cooper had any right to referral

18  fees.

19     Plaintiffs allege that Cooper misrepresented that he never co-listed a property with Derner. They

20  assert that Derner and Cooper co-listed property located at 13600 Spring Valley Road. Plaintiffs did

21  not establish this allegation by a preponderance of the evidence.

22     Cooper was asked during his § 341 meeting whether Derner and he maintained separate or joint

23  finances Cooper maintained that their finances were "completely separate." This was a false

24  statement. The court addressed this misrepresentation in its analysis of the Partnership.

25     Cooper testified during his § 341 meeting that he never paid himself for his work as SoCal's

26

27      [14] The 14795 Bohlman Road sale closed on the petition date, and the 12911 Pierce Road sale

28  closed on March 9, 2012.

21

1    manager.  Cooper changed his testimony at trial.  He stated that he was entitled to a monthly

2    management fee, and that he had made numerous withdrawals from SoCal's bank account to pay for

3    personal expenses. This was a knowingly, intentional falsehood to discourage the Chapter 7 Trustee

4    from investigating SoCal, and thus constituted a false oath.

5    III.    The 727(a)(3) Claim

6             Section 727(a)(3) authorizes this court to deny a discharge when "the debtor has concealed,

7    destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including

8    books, documents, records, and papers, from which the debtor's financial condition or business

9    transactions might be ascertained, unless such act or failure to act was justified under all the

10   circumstances of the case."  The Ninth Circuit has held that § 727(a)(3) exists so as "to make the

11   privilege of discharge dependent on a true presentation of the debtor's financial affairs."  *Lansdowne*

12   *v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994)(*quoting Meridian Bank v. Alten*, 958 F.2d

13   1226, 1232 (3d Cir. 1992).  Section 727(a)(3) requires a debtor to present "sufficient written

14   evidence which will enable [the debtor's] creditors reasonably to ascertain his present financial

15   condition and to follow his business transactions for a reasonable period in the past." *Caneva v. Sun*

16   *Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755,762 (9th Cir. 2008). The objecting party

17   can make its *prima facie* case under §727(a)(3) by establishing that the debtor failed to maintain and

18   preserve adequate records, and that such failure makes it impossible to ascertain the debtor's

19   financial condition and material business transactions." *Id.* (citations omitted).  Once the objecting

20   party shows that the debtor's records are absent or inadequate, the burden of proof then shifts to the

21   debtor to justify the inadequacy or nonexistence of the records.  *Id.* at 761.  When evaluating the

22   reasonableness of a debtor's failure to maintain records, the court should consider the nature of the

23   financial transaction at issue, whether they related to business or consumer transactions, and the

24   debtor's level of sophistication in such financial matters.  *In re Hong Minh Tran*, 464 B.R. 885, 893

25   (Bankr. S.D. Cal. 2012).

26            On April 23, 2012, this court entered a Rule 2004 Order directing Cooper to comply with

27   Plaintiffs Betty Weng and Gail Cooper-Folb's requests for a variety of documents pertaining to

28   Cooper's business records and personal records, including those of SoCal.  These requests required

Cooper to produce, among other documents:

A) *All credit card invoices, receipts, statements, credit applications, in Cooper's name, or in the name of business or entity in which Cooper held an interest.* Cooper responded to the request by stating that he would produce the requested documents.

B) *All records showing Cooper's ownership interest in any entity, company or business for the past 3 years.* Cooper responded to the request by stating that he would produce the requested documents.

C) *All records of business expenses related to any entity, company or business in which Cooper had an interest within the past 3 years.* Cooper responded to the request by stating that he would produce the requested documents.

D) *All profit and loss statements and balance sheets from 2010 through 2012 for any entity, company or business in which Cooper held an interest.* Cooper responded to the request by stating that he would produce the requested documents.

E) *Cancelled checks, check registers, bank statements and bank records from January 1, 2008 to the date of the 2004 Order for any entity, company or business in which Cooper held an interest, any accounts on which he had signing privileges, both personal and business, including Citibank accounts ending 9177, 5275, and 9876.* Cooper responded that he did not have any of documents specific to this request.

F) *Accounts Receivable statements for 2010 through 2012 for any entity, company or business in which Cooper held an interest.* Cooper responded to the request by stating that he would produce the requested documents.

G) *Accounting data maintained in any software for 2010 through 2012 for any entity,*

23

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  *company or business in which Cooper held an interest.*  Cooper responded that he did not

2  have any documents specific to this request.

3  Cooper produced the following SoCal documents: (1) a transaction report generated by

4  Intero Franchise, detailing SoCal's franchise fee payments, revenue payments received by SoCal's

5  sole franchisee, and monthly franchise fees paid by SoCal; (2) marketing materials Cooper used to

6  solicit SoCal investments; and (3) at least one copy of the SoCal operating agreement.  Cooper did

7  not produce any financial records, accounting records, or bank statements concerning SoCal.  He

8  also did not produce any documentation pertaining to its business expenses.

9  Cooper's trial testimony regarding the fate of SoCal's business documents was inconsistent.

10  He testified that the boxes containing his various business and financial records (the "Records")

11  were put in storage after he left Brandt.  He was uncertain whether the Records were stored in

12  Brandt's home or a storage facility.  Cooper initially stated that he requested that Brandt mail him

13  the Records, and that when Brandt did not, he asked her to give him access to the storage space.

14  Cooper testified that Brandt then informed him that she had disposed of the Records.  Cooper did not

15  remember when this conversation occurred. Cooper later testified that he actually traveled to

16  Southern California to retrieve the Records several weeks before he filed his Chapter 7, and that

17  Brandt informed him during that visit that she had given the Records to a girlfriend who had

18  destroyed them.

19  Cooper's trial testimony also varied from his meeting of creditors testimony. Rather than

20  informing the Trustee that the documents had been destroyed, Cooper testified that "I'd have to

21  locate them.  Its been several years now."

22  Given his ever changing testimony, creditors still do not know if the SoCal business records

23  exist and if so, where they are located.  More than a quarter million dollars flowed through SoCal's

24  bank account, and the Trustee and creditors are entitled to know what Cooper did with these funds.

25  Because Cooper failed to maintain adequate financial records, the Trustee and his creditors cannot

26  fully assess what claims may exist arising from SoCal's business operations.  Cooper's shifting

27  testimony do not justify his failure to retain or produce the Records.  These facts justify a denial of

28  his Chapter 7 discharge under § 727(a)(3).

24

IV.    Cooper's Evidentiary Objection

Cooper objected to the admission of Plaintiffs' Exhibits 127 and 129, which are annotated copies of Cooper's Verizon phone records, and Plaintiffs' Exhibit 124, which is an annotated copy of Cooper's AT&T phone records (collectively, the "Phone Records").  Cooper claimed that these exhibits were voluminous, contained numerous annotations by Plaintiff Cooper-Folb, and thus did not accurately represent his phone records.  Plaintiffs asserted that they were introducing the Phone Records as "charts" or "summaries" of Cooper's phone activity under Fed. R. Evid. 1006.  Cooper does not believe that the Phone Records are summaries or charts, and that even if they qualify as such, Plaintiffs did not made them available to Cooper before trial.

Fed. R. Evid. 1006 provides in relevant part that a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."  Plaintiffs must establish that the underlying materials upon which the summary is based are admissible in evidence, and the underlying documents were made available to the opposing party for inspection. *Paddock v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir.1984).  Nothing in the rule imposes a disclosure requirement with respect to the summaries themselves, and courts have explicitly recognized that the rule contains no such disclosure requirement. *Irons v. Aircraft Serv. Int'l, Inc.*, 392 Fed. Appx. 305, 314–15 (5th Cir.2010) (finding that decision to admit summaries not disclosed until the day of trial fell within the trial judge's broad discretion under Rule 1006); *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 753 (7th Cir.2005) ("[Rule 1006] does not say when the summaries must be made available to the party—for that matter, it nowhere states that the summaries must be made available to the opposing party."); *Montgomery v. CitiMortgage, Inc.*, 2013 WL 3895046 (S.D.Miss. July 29, 2013) (same).

The Verizon Phone Records are 403 pages of multiple columns of phone numbers representing inbound and outbound calls on Cooper's Verizon account.  The AT&T phone records are 286 pages long and are identically formatted.  Cooper-Folb annotated the Phone Records by identifying the telephone number of real estate agents and other parties involved in Derner's

Case: 12-05122    Doc# 162    Filed: 09/10/14    Entered: 09/10/14 16:33:43    Page 25 of
27

exclusive listings. Cooper-Folb testified that she culled these phone numbers from Derner's business records and cross-referenced them against numbers in the Phone Records.

The Phone Records are not "summaries" or "charts" under Rule 1006. The Phone records are literally the telephone records themselves, and they do not summarize or otherwise analyze them. At best, they appear to be an incomplete attempt at distilling Cooper's records into something admissible and relevant: i.e., how many telephone calls did Cooper make or receive relating to Derner's listings. Accordingly, Cooper's objections are sustained, and the Phone Records are inadmissible.

**Conclusion**

For the reasons set forth above, Cooper's discharge is denied under 11 U.S.C. §§ 727(a)(2), (a)(3) and (a)(4). Plaintiffs shall submit an appropriate judgment.

**\*\*\* END OF ORDER \*\*\***

**COURT SERVICE LIST**

Recipients are ECF participants

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28